## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2020-0004 |
| | ) | |
| LIONEL WOODLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
*For the Government*

**Gabriel J. Villegas, Esq.,**
St. Croix, U.S.V.I.
**Melanie Lark Turnbull, Esq.,**
St. Thomas, U.S.V.I.
*For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Lionel Woodley's ("Defendant") "Motion to Suppress Evidence and Statements" ("Motion to Suppress") (Dkt. No. 26); the Government's Opposition thereto (Dkt. No. 33); and the evidence and arguments presented at the suppression hearing. For the following reasons, the Court will grant in part and deny in part Defendant's Motion to Suppress.

## I.     BACKGROUND

On February 18, 2020, the Government filed a six-count Indictment against Defendant charging him with: felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 1); felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 2); possession of a firearm in a school zone in violation of 18 U.S.C. §§

922(q)(2)(A) and 924(a)(1)(B) (Count 3); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 4); possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 5); and, possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) (Count 6). (Dkt. No. 1).

On April 6, 2020, Defendant filed the instant Motion to Suppress. (Dkt. No. 26). At the subsequent suppression hearing held on October 23, 2020,[1] the Government presented the testimony of Officer Rashid Isles ("Officer Isles") of the Virgin Islands Police Department ("VIPD"), VIPD Officer Dirk Marshall ("Officer Marshall"), and VIPD Officer John Pierre Modeste ("Officer Modeste"). The following facts emerged from the record established at the suppression hearing.[2]

Officer Marshall testified that on March 17, 2019, he conducted a traffic stop in the vicinity of Estate Barren Spot in St. Croix. (Hr'g Tr. at 58). At approximately 11 p.m., he and his partner, Officer Modeste, were at a traffic light near Sunny Isles Shopping Center when he observed a vehicle turn into a parking lot and proceed to run a stop sign. *Id.* at 58-61. Officer Marshall testified that he engaged his emergency lights and attempted to make a traffic stop. *Id.* at 62. He then observed the vehicle overtake another vehicle in a no-passing zone. *Id.* at 63-65. The vehicle accelerated at a high rate of speed, and Officer Marshall pursued and eventually stopped the

---

[1] The Court held a second hearing on March 4, 2021 wherein the parties presented further oral argument.

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

vehicle. *Id.* at 62, 66. Officer Marshall then approached the vehicle and requested the driver's license and vehicle documents. *Id.* at 66. Officer Marshall testified that, as he was speaking to the driver—identified as Defendant—he began to smell the odor of unburnt marijuana coming from the vehicle. *Id.* at 67, 94-95. He asked Defendant if he was smoking, and Defendant responded that he had smoked "earlier." *Id.* at 67. Office Marshall testified that he "wasn't satisfied" with Defendant's answer that he had smoked earlier because Officer Marshall was smelling the odor of *unburnt* marijuana. *Id.* at 68. Therefore, Officer Marshall requested that Defendant exit the vehicle. *Id.* Upon exiting, Officer Marshall conducted a pat-down of Defendant for weapons. *Id.* at 70. Meanwhile, Officer Modeste was standing at the rear of the vehicle on the driver's side. *Id.* at 70-71. He was armed with his service weapon and a long rifle. *Id.* at 71.

From inside the vehicle, Officer Marshall saw a revolver in the open center console. *Id.* at 71. Upon seeing the firearm, Officer Marshall stepped from inside the vehicle while moving to handcuff Defendant and simultaneously asking Defendant whether he had a license for a firearm in the Virgin Islands. *Id.* at 72-74. Defendant answered "no." *Id.* at 72. After Defendant said "no," Officer Marshall then stated that he was under arrest for possession of an unlicensed firearm. *Id.* at 75. Officer Marshall testified that his purpose in placing Defendant in handcuffs was to detain him, given Defendant's close proximity to the gun. *Id.* at 73-74. Officer Marshall then called in the forensics unit to process the vehicle. *Id.* at 75. He then went back into the vehicle to ensure that the hammer of the gun was in a safe position and placed the gun on the seat of the car. *Id.* at 76.

Officer Modeste testified that on March 17, 2019, he was in the passenger seat of a marked police unit with his partner, Officer Marshall, at the Sunny Isles traffic light when he observed a vehicle turning into a parking lot and then failing to stop at a stop sign. *Id.* at 96-97. Officer Marshall turned on the police car's emergency lights to attempt to stop the vehicle and Officer

Modeste witnessed the vehicle improperly overtake another vehicle. *Id.* at 102. The officers were able to catch up with the vehicle and pull it over. *Id.* While Officer Marshall made contact with the driver, Officer Modeste stood to the rear of the vehicle. *Id.* at 103. Officer Modeste testified that Officer Marshall went to search the car and "came out" of the car and asked the driver whether he had a license for the firearm. *Id.* at 103-104. The driver answered "no" and he was handcuffed. *Id.* at 104. They then waited for additional units and forensics to arrive at the scene. *Id.*

Finally, Officer Rashid Isles of the VIPD Forensics Unit testified that at approximately 12 a.m. on March 18, 2019, he was called to a crime scene in the vicinity of Barren Spot in St. Croix. *Id.* at 8-9. He was informed by Officer Marshall that there was a gun discovered in the car. *Id.* at 10. Officer Isles testified that he began photographing the scene and smelled unburnt marijuana. *Id.* at 10-11, 32. He first started smelling the marijuana when he was taking photographs of the firearm from outside the vehicle when the car window was rolled down. *Id.* at 45, 56. He then began conducting an inventory search of the vehicle. *Id.* at 15-16. During this search, Officer Isles discovered a maroon bag in the passenger side of the vehicle containing small bills and a plastic bag containing a green-leafy substance that looked and smelled like marijuana. *Id.* at 17-18. Officer Isles testified that he concluded that the rest of the search should be continued at the VIPD's impound lot, and therefore the bag, its contents, and the firearm were secured for transport. *Id.* at 18. The maroon bag was also found to contain a digital scale and plastic bag containing a white granular substance which tested positive for cocaine. *Id.* at 35-37.

## II.     APPLICABLE LEGAL PRINCIPLES

### A.  Fourth Amendment Search and Seizure

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and

are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo,* 500 U.S. 565, 580 (1991)); *see also Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006) ("Generally, a seizure is reasonable only where it is justified by a warrant or probable cause.").

"[O]nce the defendant has established a basis for his motion, *i.e.,* the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). Evidence obtained as a result of an unreasonable search or seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as the result of an unlawful search and seizure).

One exception to the Fourth Amendment's warrant requirement is the automobile exception. "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see also United States v. Donahue*, 764 F.3d 293, 295 (3d Cir. 2014) ("The Supreme Court has interpreted—and reinterpreted—the automobile exception so expansively that the Court essentially has obviated the requirement that the government obtain a warrant to search a vehicle provided it has probable cause to believe that the vehicle contains evidence of a crime."). Further, "[w]hile a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." *Burton,* 288 F.3d at 100. Because there is no exigency requirement, "probable cause does not dissipate after the

automobile is immobilized." *Donahue*, 764 F.3d. at 300. Accordingly, a vehicle can be searched without a warrant once probable cause exists "even though [the government] has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id.*

Probable cause to search a place exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Burton*, 288 F.3d at 103 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotations omitted). In the Third Circuit:

> The probable cause inquiry is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men.". . . [The Court] evaluate[s] "the events which occurred leading up to the ... search, and then . . . [decides] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause."

*Donahue*, 764 F.3d at 301 (citations omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Beyond the automobile exception to the warrant requirement, the Supreme Court established in *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer lacking a warrant or probable cause may conduct what is commonly referred to as a "*Terry* stop"—a brief, investigatory stop when the "officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Under the *Terry* test, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). "Evidence obtained as the result of a *Terry* stop that does not meet this exception must be suppressed as fruit of the poisonous tree." *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010) (quoting *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)) (internal quotation marks

6

omitted); *see also United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("Where reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed.").

### B. Fifth Amendment *Miranda* Rights

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). "When the police fail to give adequate *Miranda* warnings . . . any statement made by the individual who is subject to custodial interrogation is inadmissible at trial." *United States v. Brooks*, 358 F. Supp. 3d 440, 476 (W.D. Pa. 2018) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)).

*Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *Quarles*, 467 U.S. at 654. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v.*

*Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). Because the defendant must be both in custody and subject to an interrogation to trigger *Miranda* warnings, "in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997).

For *Miranda* purposes, "the usual traffic stop is more analogous to a so-called '*Terry* stop,' . . . than to a formal arrest" and therefore "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984) (internal citation omitted). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. *Id*. at 439. However, if "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id*. at 440 (citing *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*)).

### III.    DISCUSSION

Defendant generally argues that the police lacked probable cause, reasonable suspicion, or consent to search his vehicle. (Dkt. No. 26 at 4). He requests that the Court suppress the evidence produced from those alleged invasions of his constitutional rights. *Id*.

#### A.  Initial Stop of Vehicle

The Government argues that the initial stop of Defendant's vehicle was proper because it was based on probable cause, as police observed Defendant committing at least one traffic violation. (Dkt. No. 33 at 3). The Court finds that the initial stop of the car Defendant was driving by Officers Marshall and Modeste was proper.

8

Stopping a car and detaining its occupants constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Hensley*, 469 U.S. 221, 226 (1985)); *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990). While the existence of probable cause justifies a traffic stop, *Whren v. United States*, 517 U.S. 806, 810 (1996), the Third Circuit has held that only a "reasonable suspicion" that criminal activity is afoot, as established in *Terry v. Ohio*, 392 U.S. 1 (1968), is necessary to justify a routine traffic stop. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006); *see also Johnson*, 63 F.3d at 245 ("[A] stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that . . . either the vehicle or an occupant' has violated the law.") (quoting *Prouse*, 440 U.S. at 663).

Where police have directly witnessed a traffic violation, a traffic stop is a reasonable seizure under the Fourth Amendment. *See United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("[A] traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."); *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("[T]he Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime.") (citing *Whren v. United States*, 517 U.S. 806 (1996)).

In this case, both Officer Marshall and Office Modeste testified to having witnessed Defendant commit two separate traffic violations: (1) running a stop sign; and (2) improperly passing another vehicle. (Hr'g Tr. at 61, 64, 98, 102). There is no evidence challenging the officers' testimony in this regard. Accordingly, under either the reasonable suspicion or probable cause

standards, it was constitutionally permissible for police to pull Defendant over and conduct a traffic stop based on the observed infractions.

### B.  Search of Vehicle

The evidence before the Court shows that after the traffic stop, police approached Defendant's car and conducted a warrantless search of the car looking for marijuana. Defendant argues that "[t]he police had neither probable cause or reasonable suspicion to search Mr. Woodley's vehicle." (Dkt. No. 26 at 3-4). The Government argues that the odor of marijuana provided police with the probable cause necessary to search Defendant's vehicle without a warrant under the automobile exception. (Dkt. No. 33 at 3-5).

Under the automobile exception to the warrant requirement, law enforcement may "seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *Burton*, 288 F.3d at 100-111 (quoting *Labron,* 518 U.S. at 940). Further, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). "[S]o long as the smell of marijuana can be particularized to a specific person or place, it is sufficient to establish probable cause." *United States v. Jackson*, 682 Fed. App'x 86, 88 (3d Cir. 2017); *see also United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996) ("[W]hen a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area.").

Officer Marshall testified that while he was standing at the side of Defendant's vehicle waiting for Defendant's vehicle documents, he smelled the odor of marijuana. (Hr'g Tr. at 67). Officer Marshall further testified that "[i]t was a very potent marijuana smell coming from the car"

and that it was so potent he "could smell it from outside the vehicle." *Id.* at 69. He specifically identified the smell as that of unburnt or fresh marijuana. *Id.* at 68. Officer Marshall's observations were corroborated by Officer Isles, a second VIPD officer, who also identified the odor of unburnt marijuana coming from the vehicle Defendant was driving. *Id.* at 10-11, 32. Officer Isles also specifically identified the smell as that of unburnt marijuana. *Id.* at 32. Both VIPD officers testified that they were able to identify the smell of unburnt marijuana based on their years of training and experience with handling and investigating cases involving marijuana. Officer Marshall's experience in this regard spanned over one hundred cases in ten years, and Officer Isles' experience spanned approximately three years. *Id.* at 11-12, 14-15, 68, 69.

The Court finds that the evidence presented at the suppression hearing demonstrates that there was an articulable and particularized odor of marijuana sufficient to establish probable cause to search the vehicle. *See United States v. Ushery*, 400 Fed. App'x 674, 676 (3d Cir. 2010) (finding that when two police officers "who both had encountered marijuana on the job on numerous occasions, smelled burnt marijuana coming from [defendant's] car, the police had probable cause to search the car"); *United States v. Harrison*, No. 17-59-GMS-1, 2018 U.S. Dist. LEXIS 42327, at *8-9 (D. Del. Mar. 15, 2018) (finding probable cause existed to search the defendant's car and the bags within when the police officer smelled the "moderate" odor of marijuana emanating from the vehicle when its door was opened); *United States v. Lackey*, No. 1:17-CR-269, 2018 U.S. Dist. LEXIS 193047, at *6 (M.D. Pa. Nov. 13, 2018) (finding probable cause to search a vehicle when suspects appeared nervous and officers smelled "marijuana emanating from the vehicle"); *United States v. Dryden*, 567 F. Supp. 2d 643, 647, 651 (D. Del. 2008) (police had probable cause to search a vehicle under automobile exception due to officer's detection of a "strong odor of unburnt

marijuana emanating from the car").[3] Because the search of the vehicle was based on probable cause that it contained marijuana, the police officers were constitutionally permitted to search the entire car—including the maroon bag found to contain the green-leafy substance, white powder, and small bills—because once probable cause exists, police are permitted to search the entire vehicle and its contents that might conceal the contraband. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").[4]

---

[3] The Court notes that an extension of a traffic stop to investigate other criminal activity implicates the protections of the Fourth Amendment. A traffic stop may be unreasonably extended in violation of the Fourth Amendment "when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)). "[A]n officer may not extend the stop to conduct [unrelated investigations] unless there is reasonable suspicion of criminal activity beyond the traffic violation." *United States v. Garner*, 961 F.3d 264, 270 (3d Cir. 2020) (citing *Rodriguez*, 575 U.S. at 357-58); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). The Third Circuit refers to the moment of "when tasks tied to the traffic stop are completed or reasonably should have been completed" as the "*Rodriguez* moment." *Garner*, 961 F.3d at 270.

In this case, Officer Marshall testified that while he was waiting for Defendant to produce his vehicle documents, he smelled the odor of unburnt marijuana. (Hr'g Tr. at 67). Based on probable cause, he extended the stop to investigate the source of the marijuana odor. Therefore, the Court finds that no Fourth Amendment violation occurred in the extension of the traffic stop. *See Garner*, 961 F.3d at 271 (Officer had "reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop and before he engaged in any unrelated investigation. So no unlawful extension of the traffic stop ever occurred."); *United States v. Crowder*, No. 4:17-CR-00291, 2019 U.S. Dist. LEXIS 31970, at *4, *9-10 (M.D. Pa. Feb. 28, 2019) (finding no constitutional violation for continued detention after an initial traffic stop when officers testified to smelling a strong odor of marijuana emanating from the vehicle when officers first approached the vehicle and the driver admitted to previously smoking marijuana in the vehicle).

[4] As the Government argues, (Dkt. No. 33 at 4), it was also lawful for Officer Marshall to ask the Defendant to step out of his car. *See Moorefield*, 111 F.3d at 12 ("[A] police officer may order the driver of a lawfully stopped car to exit the vehicle.") (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)).

Thus, the Court finds no constitutional violation in the warrantless search of the vehicle Defendant was driving.[5]

### C.  Question Regarding Defendant's Firearms License

The evidence presented at the suppression hearing shows that upon discovery of a firearm in Defendant's vehicle, Officer Marshall asked Defendant whether he had a license for the firearm to which Defendant answered "no." (Hr'g Tr. at 72). No *Miranda* warnings were given prior to this question. The Government argues that no *Miranda* warnings were necessary because Defendant at the time "was not in <u>Miranda</u> custody. His status was more akin to a <u>Terry</u> stop." (Dkt. No. 33 at 6).

As noted, *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler*, 496 F.2d at 798; *Dupree*, 617 F.3d at 731 n.7. "*Miranda* safeguards come into play whenever a person in custody is subjected to either *express questioning* or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300-301 (1980) (emphasis added). Officer Marshall's direct question as to whether Defendant had a firearms license was of the nature that Officer Marshall "*should have known* w[as]

---

[5] The Court also notes that Officer Isles testified that when he was searching the vehicle, he was "conducting a complete inventory search." (Hr'g Tr. at 15-16). "'It is well established that law enforcement officers may make a warrantless inventory search of a legitimately seized vehicle,' provided the inventory is 'conducted according to standardized criteria or established routine,'" *United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991) (quoting *United States v. Bush*, 647 F.2d 357, 370 (3d Cir. 1981) and *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987)). The Government does not address whether this was a valid inventory search, but argues instead that VIPD officers had probable cause to search the vehicle based on the odor of marijuana. (Dkt. No. 33 at 4). Because the Court has found that a warrantless search of any part of the vehicle that could conceal marijuana was permissible based on probable cause, the Court need not address whether the search sufficiently met the criteria for a valid inventory search. *See United States v. Schecter*, 717 F.2d 864, 871 (3d Cir. 1983) ("Since we find that the troopers' search of the auto at the police barracks was authorized under the automobile exception, we do not have to decide whether this search was also a proper inventory search.").

reasonably likely to elicit an incriminating response." *Id.* at 302 (emphasis in original); *see also United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012); *United States v. St. Rose*, 189 F. Supp. 3d 528, 539 (D.V.I. 2016) (finding inquiry about defendant's possession of a firearms license was interrogation under *Miranda* "because it was a direct inquiry regarding the legality of St. Rose's conduct, and therefore 'intentionally designed to evoke a confession.' . . . [and the officer] should have reasonably foreseen that his question would elicit an inculpatory response."); *United States v. Santiago*, Crim. No. 2016-0017, 2017 U.S. Dist. LEXIS 5747, at *16 (D.V.I. Jan. 16, 2017) (same). Therefore, the Court finds that Defendant was subject to interrogation by the Government for *Miranda* purposes.

Thus, the question before the Court is whether when Defendant was interrogated, he was also in custody for *Miranda* purposes. A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (quoting *Steigler*, 496 F.2d at 799); *see also United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (Courts ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004)). "This determination is objective, based on 'how a reasonable man in the suspect's

position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer*, 468 U.S. at 442).

Officer Marshall testified as follows with regard to the sequence of events surrounding his discovery of the firearm and the subsequent question regarding the firearms license:

> Upon me seeing the weapon, I got back out the vehicle. Mr. Woodley was still standing, arms to the side. My partner was behind him. And as I'm talking to him, I'm asking him if he has a firearm license in the Virgin Islands. And he said no. But, at the same time I was asking him these questions, I was putting cuffs on him to detain him, because we just found a weapon.

(Hr'g Tr. at 72). Officer Marshall testified that immediately after stepping back out of the car, he reached for his cuffs[6] and "told [Defendant] to turn around [and] put [his] hands behind [his] back." *Id.* at 74. After Defendant answered Officer Marshall's question about the gun license, Officer Marshall informed him that he was under arrest for possession of an unlicensed firearm. *Id.* at 75.[7]

Officer Marshall testified that his purpose in placing Defendant in handcuffs was to detain him, given Defendant's close proximity to the gun. *Id.* at 73-74. Generally, "the usual traffic stop is more analogous to a so-called '*Terry* stop,'" and "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer*, 468 U.S. at 439-40. Moreover, police may, short of arrest, "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see Terry*, 392 U.S. at 23-24. Therefore, in certain situations, an officer

---

[6] He stated: "I'm out of his vehicle turning to him, that's when my cuffs began to come out." (Hr'g Tr. at 74).

[7] Officer Modeste testified to a slightly different version of events. He stated that Defendant was placed in handcuffs only after he was asked whether he had a license for the firearm, and Defendant answered no. (Hr'g Tr. at 61). The Court understands from the evidence presented that this sequence of events happened in a very short period of time and several events happened simultaneously. As the officer who actually placed Defendant in handcuffs and asked him the question at issue, the Court will rely on Officer Marshall's more detailed testimony regarding the sequence of events.

might have to take "necessary measures" to "neutralize the threat of physical harm." *United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 24). Placing a defendant in handcuffs can be that "necessary measure." *St. Rose*, 189 F. Supp. 3d at 542 n.13.

However, whatever Officer Marshall's subjective intent in placing Defendant in handcuffs, the *Miranda* inquiry is objective—the proper question is how a reasonable man in Defendant's position would understand his situation. *See May*, 87 F. App'x at 227; *see also Berkemer*, 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

According to Officer Marshall, when he stepped out of the car after seeing the firearm, he reached for his cuffs and told Defendant to turn around and put his hands behind his back. (Hr'g Tr. at 73-74). Officer Marshall testified that he was in the process of handcuffing Defendant when he asked the question about whether Defendant had a firearms license. *Id.* at 72. The Court concludes that circumstances such as these—where a law enforcement officer, after discovering a firearm, ordered Defendant to turn around and place his hands behind his back, and was in the process of handcuffing him at the time that the officer was questioning him about the legality of the firearm—would have caused a reasonable person in Defendant's position to believe that the officer "would not have heeded a request to depart or to allow [him] to do so." *Willaman*, 437 F.3d at 359 (quoting *Steigler*, 496 F.2d at 799) (quotations omitted). Indeed, immediately after Defendant answered the question, Officer Marshall told Defendant he was under arrest for possession of an unlicensed firearm. (Hr'g Tr. at 75).[8] Thus, based on the totality of the

---

[8] The Court recognizes that placing a suspect in handcuffs can be permissible in the context of a *Terry* stop and does not necessarily amount to *Miranda* custody. Here, however, the testimony reveals that the handcuffing of Defendant and his placement under arrest—the latter of which is

circumstances, the Court finds that Defendant was in custody for *Miranda* purposes. *See, e.g.*, *United States v. Santiago*, Crim. No. 2016-0017, 2017 U.S. Dist. LEXIS 5747, at *15-16 (D.V.I. Jan. 16, 2017) (finding defendant was in *Miranda* custody after he was put in handcuffs after "an unrestrained and consensual conversation with [the police officer]" and then asked whether he had a license to possess the discovered firearm); *United States v. Jackson*, No. CR 07-338, 2009 WL 3008993, at *5 (W.D. Pa. Sept. 21, 2009) (finding defendant was in custody for *Miranda* purposes when he was handcuffed at the rear of his vehicle and had not been told he was not under arrest, and then police asked him about whether he had a permit for his gun); *see also United States v. Latz*, 162 Fed. App'x 113, 117 (3d Cir. 2005) (finding defendant was "clearly in custody" after being handcuffed and placed on a couch and questioned about firearms in his house).

Because Defendant was in custody and subject to interrogation without *Miranda* warnings, his statement that he did not have a license to possess the firearm will be suppressed.[9]

### D.  Seizure of the Firearm

The record before the Court shows that the firearm discovered in Defendant's vehicle was seized without a warrant. The Government argues that "[i]t was appropriate to seize, and maintain custody, of the firearm for officer safety as the police pursued the search of the vehicle for marijuana." (Dkt. No. 33 at 7-8).

---

clearly custodial—occurred within a matter of mere seconds. (Hr'g Tr. at 74-75). The Court cannot therefore conclude that these virtually simultaneous actions—with little line of demarcation between them—can escape a finding of custody under a reasonable person analysis.

[9] By contrast, Defendant's statement that he had smoked earlier, in response to Officer Marshall's question whether he had been smoking when Officer Marshall first detected the odor of marijuana, will not be suppressed because the question was permissible in the context of the initial traffic stop—which is more akin to a Terry Stop—where Defendant was not in custody. *See Berkemer*, 468 U.S. at 439-40.

The Court finds no constitutional violation in the steps Officer Marshall took to initially secure the firearm by ensuring that the hammer of the gun was in a safe position and placing the gun on the seat of the car.[10] Police are permitted to temporarily seize and secure firearms found in the course of an investigation for officer safety. *See United States v. Koepnick*, 409 Fed. App'x 138, 138 (9th Cir. 2011) (finding even without probable cause to believe a gun was illegal, that police were justified in the "temporary seizure of the gun as a reasonable safety precaution"); *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010) ("[W]e think the police were justified in temporarily seizing the shotgun under these circumstances. . . . Common sense dictates that a firearm that could be accessed by someone at the scene and used against officers or others should be unloaded, and at least temporarily, kept in a safe place."); *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir.1979) ("[The firearm's] temporary seizure, unloading, and retention by a responsible officer (here the inventory officer) seems a reasonable precaution to assure the safety of all persons on the premises during the search."); *Flanegan v. O'Leary*, Civil Action No. 14-1379, 2015 U.S. Dist. LEXIS 121460, at *8 (W.D. Pa. Sept. 11, 2015) ("[I]t is hardly surprising that longstanding, unanimous precedent supports an officer's temporary seizure of firearms for the duration of his or her investigation.") (collecting cases).

Next, the Government argues that once Defendant stated that he did not have a license to possess the firearm, the police had probable cause to seize the firearm. (Dkt. No. 33 at 8).

It is legal for certain individuals to carry a firearm in the Virgin Islands; therefore, possession of a firearm *by itself* does not provide police with probable cause to seize it. *See United*

---

[10] As noted above, the officers were allowed to search the car in which the gun was found pursuant to the automobile exception.

*States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) ("It is not necessarily a crime to possess a firearm in the Virgin Islands . . . nor does a mere allegation that a suspect possesses a firearm . . . justify an officer in stopping a suspect absent [] reasonable suspicion."); *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012); *see also St. Rose*, 189 F. Supp. 3d at 545 ("[E]ven assuming that [the officer's] conduct in discovering the gun on [defendant]'s person was legal, the mere possession of the gun by [defendant] would not, by itself, provide sufficient cause for its seizure.").

However, unlike violations of the Fourth Amendment, "the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a *voluntary* statement obtained before Miranda warnings are issued." *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) (emphasis added). Therefore, although the Court has found that Defendant's statement that he did not have a license to possess the firearm was taken in violation of *Miranda* and must be suppressed at trial, this statement may be used to establish probable cause to seize the firearm if the statement was given voluntarily. *See United States v. DeSumma*, 44 F. Supp. 2d 700, 707 (E.D. Pa. 1999), *aff'd*, 272 F.3d 176 (3d Cir. 2001) ("Although defendant's admission that there was a weapon in his vehicle will be suppressed because of the *Miranda* violation, it provided probable cause for the search of the car, where the weapon was subsequently found."); *United States v. Guillen*, 657 F. App'x 690, 692 (9th Cir. 2016) ("The statements may be used to determine whether probable cause existed even if [defendant] should first have been administered *Miranda* warnings.") (citing *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987)); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986) (holding that unwarned, voluntary statements are a proper basis for probable cause to arrest); *United States v. Jones*, 572 F. Supp. 2d 601, 612 (W.D. Pa. 2008), *aff'd on other grounds*, 388 F. App'x 175 (3d Cir. 2010) ("exclusion of an un-mirandized voluntary custodial statement for purposes of trial does not prevent the use of that statement for establishing probable

cause under the Fourth Amendment; the exclusionary rule of the Fourth Amendment operates independently of the *Miranda* rule") (citing *DeSumma*, 272 F.3d at 181)); *United States v. $107,840.00 in U.S. Currency*, 784 F. Supp. 2d 1109, 1118 n.9 (S.D. Iowa 2011) (holding that voluntary statements taken prior to *Miranda* warnings are a proper basis for probable cause to arrest).

Courts look to the totality of the circumstances to determine whether a statement was voluntary. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). "[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *Latz*, 162 F. App'x at 118 (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (internal quotation marks omitted). "A necessary predicate to a finding of involuntariness is coercive police activity." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.*

Defendant argues that his statements were coerced given the presence of two armed, uniformed officers, and while neither officer drew their service weapons, one officer—positioned close to Defendant—carried a long rifle at a 45-degree angle. However, these facts do not mandate a finding of coercion. Indeed, while the officers were armed, there is no evidence that any guns were ever pointed at Defendant.[11] *See Latz*, 162 Fed. App'x at 118 ("[The officer], who did the

---

[11] Officer Marshall testified that while Defendant got out of the car and Officer Marshall performed a pat-down, his partner Officer Modeste was standing to the rear of the car armed with his service weapon and a long rifle. (Hr'g Tr. at 71). He testified that Officer Modeste's service weapon was in its holster and the long rifle was in a "45-degree angle" known as a "low sling." *Id*. There was no testimony that guns were pointed at Defendant.

questioning, may have been holding a shotgun. However, nothing suggests, and Latz does not contend, that [the officer] pointed the shotgun at Latz during the questioning. . . . Under these circumstances, we cannot find that Latz's will was overborne."); *cf. St. Rose*, 189 F. Supp. 3d at 540-42 (finding statements were involuntary when "at the time [the defendant] was asked and responded to [the officer's] inquiry regarding the firearms license, both Officers were standing in close proximity to [the defendant] and were pointing their weapons at him."). Nor is there evidence of threats, prolonged questioning, hostile tones, or other coercive actions. *United States v. Bass*, Criminal No. 2016-0018, 2017 U.S. Dist. LEXIS 36986, at *14 (D.V.I. Mar. 15, 2017). Although Defendant was in the process of being handcuffed while the question regarding the firearms license was being asked, the record does not show evidence of the kind of coercive police activity that would warrant a finding of involuntariness. *See id.* ("While Bass was handcuffed, there was no evidence that any of the corrections officers had their guns drawn, either when they detained Bass or when [Corrections Officer] Brathwaite questioned him."); *United States v. McIntosh*, Criminal No. 2016-0020, 2017 U.S. Dist. LEXIS 6115, at *29 (D.V.I. Jan. 17, 2017) (finding statement was voluntary when neither officer had his gun drawn, there were no indications of other threats and the defendant was in handcuffs for less than a minute when he was questioned).

Thus, the Court finds that, viewing the totality of the circumstances, Defendant's statement that he did not have a firearms license was voluntary. Accordingly, the seizure of the gun was based on probable cause that it was evidence of a crime, i.e. possession of a firearm without a license.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendant's Motion to Suppress. The Court will suppress Defendant's statement that he did not have a license

21

to possess a firearm, but otherwise deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date:   March 20, 2021

_____/s/_____
WILMA A. LEWIS
Chief Judge